GUSSIE ROSENBLUM, Appellant, *v.* JOSEPH T. HIGGINS, Individually, and as Sheriff of the County of New York, Respondent.

First Department, February 2, 1934.

*H. Eliot Kaplan* of counsel [*Meyer Kivowitz*, attorney], for the appellant.

*John Caldwell Myers* of counsel [*Hugh B. Archer* with him on the brief; *John Caldwell Myers*, attorney], for the respondent.

GLENNON, J. This is an appeal from an order denying a motion for summary judgment.

It is necessary to review the facts out of which this litigation grew, in order to indicate our reasons for believing that a proper determination was made.

The appellant herein is the plaintiff in a separation action in the Supreme Court, Kings county. During the pendency thereof, she was awarded the sum of fifteen dollars a week as temporary alimony. Her husband, the defendant in that action, fell into arrears. Thereafter an order was entered adjudging him in contempt for his failure to make payments in full and he was fined the sum of $575. Later a warrant was issued to the sheriff of New York county.

On September 10, 1932, the sheriff took Rosenblum into his custody and held him a prisoner in the jail of the county of New York. About February 23, 1933, while Rosenblum was still in custody, the separation action came on for trial before a justice sitting at Special Term, Kings county. The defendant Rosenblum withdrew his answer and counterclaim and the plaintiff took an inquest in open court. The court orally directed that a judgment of separation be entered in favor of the plaintiff. Upon the consent of the respective attorneys, the court entered an order of reference to an official referee to hear and report on the following questions:

" 1. The amount of alimony that the defendant under the present circumstances is capable of paying to the plaintiff herein.

" 2. Whether the imprisonment of defendant should be prolonged.

" 3. Whether defendant's failure to pay alimony was wilful or due to his poverty."

Thereafter and pursuant to the order, hearings were had before Hon. Russell Benedict, an official referee, on March 1 and 2, 1933. Prior thereto and on February 28, 1933, this respondent, the sheriff, was served with an order made by the justice who presided at the trial directing him to produce the prisoner before the official referee on March 1, 1933. At the conclusion of the hearings, the official referee found that Rosenblum, by reason of his poverty, would not

be capable of paying alimony to the plaintiff until June, 1933. He thereupon ordered the deputy sheriff in charge of the prisoner to release him. At the same time he wrote on the order of reference the following:

" Prisoner discharged.
" Dated *March* 2, 1933.
" RUSSELL BENEDICT, <em>Official Referee.</em>"

The deputy sheriff had two alternatives. One was to comply with the order of the official referee, and the other was to disobey the order and risk punishment for a contempt of court. Naturally he complied with the directions of the official referee. At that time the prisoner had been in the custody of the sheriff for five months and twenty-two days, just eight days less than the six months' period, at the termination of which he would have been entitled to his release and discharge.

This action was commenced on March 9, 1933. If plaintiff is to succeed herein, the net result will be that the sheriff will be compelled to pay out of his own pocket the total amount which the prisoner owed to the plaintiff at the time of his commitment.

On May 11, 1933, Rosenblum made an application for an order confirming the referee's report and discharging him from imprisonment in the county jail *nunc pro tunc*, as of March 2, 1933. That motion was opposed by the plaintiff herein, but the same justice who had directed the original order of reference entered an order confirming the report of the official referee in all respects and released Barnet Rosenblum from imprisonment *nunc pro tunc*, as of March 2, 1933. The plaintiff served a notice of appeal from that order, but has not prosecuted it.

This action was predicated on section 514 of the Correction Law which reads:

" Confinement of civil prisoner. A civil prisoner, committed to jail upon process for contempt, or committed for misconduct in a case prescribed by law, must be actually confined and detained within the jail, until he is discharged by due course of law, or is removed to another jail or place of confinement, in a case prescribed by law. A sheriff or keeper of a jail, who suffers such a prisoner to go or be at large out of his jail; except by virtue of a writ of habeas corpus, or by the special direction of the court committing him, or in a case specially prescribed by law; is liable to the party aggrieved, for his damages sustained thereby, and is guilty of a misdemeanor. If the commitment was for the nonpayment of a sum of money, the amount thereof, with interest, is the measure of damages."

It is quite apparent that the Legislature intended to punish a sheriff or keeper of a jail " who suffers such a prisoner to go or be at large out of his jail." According to the strict wording of the section, the official who is derelict in his duties would be guilty of a misdemeanor and, in addition thereto, liable to pay damages, which in a case of this type would be admeasured in the sum of money due at the time of the release.

It may well be that the official referee exceeded his power in directing the deputy sheriff to release the prisoner, since he was directed to hear and report and not to hear and determine. Still, if · the deputy failed to comply with his directions, the official referee had the power to cite him for a contempt of court. Notwithstanding some authorities seemingly to the contrary, it is difficult to understand that the legislative intent was to punish a sheriff or a jail keeper in the manner described in the act, in a case of the type now under consideration. However, we do not rest our decision on that point. The order entered on June 5, 1933, providing for the release of the prisoner, took effect as of March 2, 1933. That order is still outstanding. " Both parties [to that case] were before the court. So far as their rights as to one another are concerned, they are concluded by the order." (*Perkins* v. *Perkins*, 225 Mass. 392, p. 398.)

Plaintiff's cause of action against the sheriff is based solely upon the so-called wrongful discharge of her husband as of March 2, 1933. If wrong there was in the original discharge, it was cured by the court in the proper exercise of its discretion. Rosenblum, prisoner, was discharged by " due course of law," within the meaning of section 514 of the Correction Law. Any cause of action which plaintiff believed had accrued by virtue of the discharge, no longer existed. If the court of last resort had affirmed the order entered by the court at Special Term, there is no doubt in our minds that the cause of action pleaded here, which seemingly had accrued, would be barred. If the court at Special Term had had the time to take the testimony which was adduced before the official referee, undoubtedly it would have directed the release of the prisoner either on March second, or possibly prior to that date. In other words, there was a delay in the disposition of the case, within the meaning of *Mitchell* v. *Overman* (103 U. S. 62). Since the order has not been modified and is still outstanding, the plaintiff in this case has no cause of action against this respondent.

For the reasons assigned herein the order should be affirmed, with twenty dollars costs and disbursements.

FINCH, P. J., and MERRELL, J., concur; TOWNLEY and UNTER-MYER, JJ., dissent and vote to reverse and grant the motion to the

extent of directing summary judgment in favor of the plaintiff and against the defendant for the sum of $575, with interest from March 2, 1933, and severing the action as to the balance of the plaintiff's claim.

UNTERMYER, J. (dissenting). The material facts are not in dispute. In September, 1928, the plaintiff commenced an action for separation in the Supreme Court of Kings county against her husband, Barnet Rosenblum. In that action alimony *pendente lite* at the rate of fifteen dollars per week was allowed by the court. The husband, having failed to make payments of alimony amounting to $575 on September 10, 1932, was committed to the New York county jail under an order of the Supreme Court of Kings county which adjudged him guilty of contempt of court. Accordingly, unless released pursuant to law, he was not entitled to be discharged from the county jail, without paying the arrears of alimony, until six months from the date of incarceration (Judiciary Law, § 774), or March 9, 1933. While so incarcerated the separation action came to trial and, no answer having been interposed by the husband, the only question to be litigated was the amount of alimony to be paid. By consent of the parties the matter was referred to an official referee " to hear and report to this court on the following questions: 1. The amount of alimony that the defendant under the present circumstances is capable of paying to the plaintiff herein. 2. Whether the imprisonment of defendant should be prolonged. 3. Whether the defendant's failure to pay alimony was wilful or due to his poverty." Although the order of reference merely directed the referee to hear and report to the court, nevertheless, on March 2, 1933, after concluding the taking of testimony, he directed the release of the husband from custody, without making any previous report to the court. This he did by indorsing upon the order which directed the production of the prisoner before the referee, the following: " Prisoner discharged. Dated March 2, 1933," and signed his name as " Official Referee." Upon this order and against objection by the plaintiff, the prisoner was forthwith discharged by the sheriff. Thereupon, on March 9, 1933, this action was begun against the sheriff, pursuant to section 514 of the Correction Law, to recover the sum for the non-payment of which the husband was committed, on the ground that the official referee, appointed to " hear and report," was without jurisdiction to direct the discharge of the prisoner. Two months after the prisoner had been released from custody the official referee made his report to the court, reciting his appointment as official referee " to hear and report to this court " on the issues specified and reporting

that in his opinion the husband was not in a position to pay future alimony until June, 1933; that his previous failure to pay alimony was not willful but due to inability to pay, and that his imprisonment " should not be further prolonged after March 2, 1933, and he should be discharged from custody, and I so directed." On June 5, 1933, the court confirmed the report of· the official referee and, among other things, it " ordered, adjudged and decreed that the defendant be and is released from the custody of the County Jail of the County of New York, and this order pertaining to the release of the defendant, Barnet Rosenblum, from imprisonment in the County Jail and releasing him from the custody of the Sheriff of the County of New York shall be made *nunc pro tunc* as of the 2nd day of March, 1933, the date the Official Referee directed the Sheriff of the County of New York to release the said defendant Barnet Rosenblum."

Section 115 of the Judiciary Law, which specifies the powers and duties of official referees, so far as material, provides that " To any such official referees may be referred any action, matter or proceeding pending in said Supreme Court, or in a Surrogate's Court, referable by statute or the rules and practice of said court, in which the justice or surrogate making the order of reference shall deem that for any reason the expense of such reference should not be borne by the parties to such action, matter or proceeding, and to· any such official referee may also be referred any action, claim, or special proceeding of a civil nature, by consent of the parties thereto." By section 116 it is further provided that "As to all *ex parte* motions and motions, actions or proceedings submitted to said referee by stipulation of the parties appearing therein, or order of the court, except matrimonial actions, the same shall be deemed duly referred to said official referee and, in addition to all the powers now conferred by section four hundred and sixty-nine of the Civil Practice Act, he shall proceed therein with the same power and authority ·as a justice presiding at a regular Special Term of the Supreme Court and entertain and grant motions for a new trial, grant stays and orders to show cause; and similar jurisdiction and authority as to any other action or proceeding referred to him by order of the Supreme Court including matrimonial actions."

We think the official referee was without jurisdiction to direct the release of the prisoner. Although wider powers may be conferred on official referees under section 116 of the Judiciary Law than on other referees (Civ. Prac. Act, § 469), they nevertheless are such, and such only, as the order of reference prescribes. An official referee is an officer of the court to whom " may be referred any action, matter or proceeding pending in said Supreme Court "

either by " order of reference " or by " consent of the parties." (Judiciary Law, § 115.) One or the other of these is a condition precedent to the exercise of any of the powers conferred upon official referees by section 116 of the Judiciary Law. By its order of reference the court may refer one issue or several issues to the referee either for complete determination or for the purposes only of reporting thereon to the court. A report so made is advisory merely (*Perkins* v. *Perkins*, 130 App. Div. 193; *Johnstone* v. *Johnstone*, 130 Misc. 243) and may be approved or disregarded by the court. It would be intolerable if, as the defendant contends, the jurisdiction of an official referee could not be circumscribed by the order of the court appointing him, and if, in consequence, such a referee appointed, it might be, to report to the court upon a single issue, could assume jurisdiction to decide all the issues in the action. Here the court retained complete jurisdiction of the cause for the purpose of deciding all the issues, and it cannot, therefore, be true that the referee acquired the very jurisdiction which the court retained. The court never having vested the official referee with the authority to determine any issue, the court alone had the power to direct the release of the prisoner. Indeed, the subsequent order of the Supreme Court providing for the discharge of the prisoner as of March 2, 1933, constituted implied recognition of the fact that the referee's order, likewise discharging him, was inoperative and void.

But it is said that even if the order of the referee is void for want of jurisdiction, it must be regarded as the order of the Supreme Court, a court of general jurisdiction, to whose decrees a presumption of validity attaches which will protect a ministerial officer in the execution of its mandate. (*Kerr* v. *Mount*, 28 N. Y. 659; *Porter* v. *Purdy*, 29 id. 106; *Roderigas* v. *East River Savings Institution*, 76 id. 316; *Savacool* v. *Boughton*, 5 Wend. 170.) This presumption concededly does not attach to the decrees of courts or other bodies of limited or special jurisdiction. (*Turner* v. *Bank of North America*, 4 Dall. 8; *Frees* v. *Ford*, 6 N. Y. 176; *Levy* v. *Melody*, 50 Misc. 509.) " Nothing shall be intended to be out of the jurisdiction of a Superior Court, but that which specially appears to be so; and, on the contrary, nothing shall be intended to be within the jurisdiction of an inferior court but that which is so expressly alleged." (*Peacock* v. *Bell*, 1 Saund. 73.) This statement of the rule has been approved and followed in subsequent decisions (*Gilbert* v. *York*, 111 N. Y. 544). To the same effect are *Bullymore* v. *Cooper* (46 N. Y. 236); *Matter of Leggat* (162 id. 437); *Bennett* v. *Burch* (1 Den. 141). It may also be true, though not important here, that a ministerial officer is protected in the execution of the

mandate even of a court of limited jurisdiction, if it contains recitals of the extrinsic facts upon which its jurisdiction depends. But if the officer executing such a mandate "wishes to avail himself of the protection of the order alone, he must see to it that it contained sufficient allegations of all the facts which must exist to confer general and special jurisdiction." (*Bullymore* v. *Cooper, supra,* 242.) We need not, however, concern ourselves with this aspect of the case, for the referee's order directing the discharge of the prisoner contains no recitals of any kind. Unless, therefore, the official referee is to be regarded as a court of general jurisdiction, the defendant in executing his order did so with knowledge that at any time he might be placed in a position where he would be under the necessity of defending the jurisdiction of the referee.

We are not prepared to concede that an official referee is a court of general jurisdiction. On the contrary, if he can be characterized as a court at all, it is only as a court of a strictly limited and special kind. Although his office is a statutory one, his jurisdiction exists only by virtue of the order of reference, which defines its scope and limits its exercise. The court may refer to him the whole controversy for decision or it may refer a particular issue, or again, it may refer to him one or more issues only to report thereon and not for the purpose of making any final determination. It would be anomalous to hold that an officer appointed as occasion may require for a particular and limited purpose constitutes a court of general jurisdiction and that his mandates may be executed without investigation as to whether the jurisdiction which is exercised has been delegated to him by the court. The unauthorized order of the referee, not the order of a court of general jurisdiction, affords, therefore, no protection to the defendant in releasing the prisoner (*Bullymore* v. *Cooper, supra; Matter of Leggat, supra*), unless the subsequent order of the Supreme Court of June 5, 1933, was competent to cure these infirmities *nunc pro tunc.*

We are of the opinion that no such order could retroactively accomplish this result. It has been correctly said that "The power of courts, whether of law or equity, to make entries of judgments or decrees *nunc pro tunc* in proper cases and in furtherance of the interests of justice, is one which has been recognized and exercised for a long time as a part of their jurisdiction." (*Jewett* v. *Schmidt,* 108 App. Div. 322.) But such an order presupposes an order previously allowed but not entered or a situation where, after submission, a delay in the disposition of the case is due to the act of the court. (*Mitchell* v. *Overman,* 103 U. S. 62.) Its office is to speak what has been done, not to create (*Cox* v. *Gress,* 51 Ark. 224); or, as it has been otherwise stated, "to supply

an omission in the record of action really had but omitted through inadvertence or mistake * * * or to enter an order which should have been made as a matter of course, and as a legal duty " (*City of Grand Rapids* v. *Coit,* 151 Mich. 109). The principle applicable here was stated in *Guarantee Trust Co.* v. *P., R. & N. E. R. R. Co.* (160 N. Y. 1), where the court said: " The theory upon which an order may be granted to take effect as of a previous date, is that some ruling has been made which was not properly, or was improperly, entered. A court has no power to have a new order or ruling so entered, thus bringing into the record an element which did not previously exist. The facts must exist, and then if the record of them is imperfect or incomplete, it may be amended, but if the record shows the actual facts then no order can be properly made changing them so as to take the place of an act that was required to be previously performed. While a court may record an existing fact *nunc pro tunc,* it cannot record a fact as of a prior date when it did not then exist."

Enough has been said to show that the power of the court in this respect has definite limitations. If the prisoner here was discharged by the defendant without justification in law, no court by a later order entered *nunc pro tunc* could deprive the plaintiff of her cause of action by any change in the record of these past events. A case in all respects in point is *Gray* v. *Brignardello* (68 U. S. [1 Wall.] 627). There a commissioner had been appointed to take and state partnership accounts, to ascertain the nature and extent of the partnership property and to report to the court. The decree further provided that the commissioner, " after he shall have made such reports, and the same shall have been passed upon by the court, and in accordance with such further directions in this behalf, if any, which the court may give him, do proceed to sell all the real and personal estate of the said partnership, both or either of them." The commissioner made his report, but without waiting for confirmation sold the partnership property. It was held that although " the decree or judgment of a court, which has jurisdiction of the person and subject-matter, is binding until reversed, and cannot be collaterally attacked," yet there being no jurisdiction the sale was void and the purchaser did not acquire title to the property. Said the court: " No authority was given to sell until the commissioner had reported the state of the accounts, and what property was owned by the different firms, and the court had passed on the report. The court, properly enough, reserved the right to approve or disapprove the report before the authority to sell was complete." There also it was contended " that a *nunc pro tunc* decree, subsequently entered, gave the power to make the sale, and rendered valid

what, without it, would have had no validity." But the decree *nunc pro tunc* was held to be without effect because predicated on a state of facts which did not exist. Referring to that question the court said (p. 636): " A *nunc pro tunc* order is always admissible, when the delay has arisen from the act of the court. But that is not this case. There is nothing to show that the report of the commissioner was approved prior to the sale; no evidence that any decree was entered, or any authority even to make one, on the day stated, nor in fact that the court was in session on that day. By no rule of law can a decree, which was clearly an afterthought and made subsequent to the sale, bolster up the authority to make it." We think the decision in that case is controlling upon the questions presented here and that the defendant is not protected either by the order of the referee or by the order thereafter entered *nunc pro tunc*.

Very applicable also is the decision in *Perkins* v. *Perkins* (225 Mass. 392). The parties, husband and wife, were divorced in 1907. By that decree the husband, in addition to a specified sum to be paid for the support of two children of the parties, was directed to pay " the expense of necessary medical attendance to be rendered to said children by Dr. Burley." Dr. Burley having died, the wife in 1911 secured for the children the services of Dr. Ryder. Dr. Ryder brought suit against the husband for these services (*Ryder* v. *Perkins*, 219 Mass. 525), but was held not entitled to recover because the wife had no discretion with respect to the physician to be employed, and by the terms of the decree was limited to the employment of Dr. Burley who had died. In November, 1915, upon the application of the wife, a decree was made which, among other things, provided that the wife should have full discretion concerning the selection of physicians for the children and which further provided that to this extent the decree should " take effect as of the last Monday of December, 1910." It was held that although " a defect in a judgment, order or decree which expressed exactly the intention of the court at the time when it was made cannot be remedied by a *nunc pro tunc* entry, and that an initial infirmity cannot be bolstered by the entry of a new order to take effect retrospectively as of a date anterior to that on which in fact it is entered," nevertheless that because the decree had relation to the support and care of children, " extensive revision and alteration of previous decrees is authorized and exercised " (p. 397). The decree having been properly made was held to be conclusive upon the parties who were then before the court. It is significant however, that the court expressly limited the effect of the decree by excluding Dr. Ryder from its operation, saying, " It would be

beyond the power of a court to establish, by the entry of a *nunc pro tunc* order authorizing the libellant [the wife] to employ any physician she chose, a legal liability for such employment of a physician by her at a time when she had no such authority and could not pledge the credit of the libellee [the husband] therefor. A liability to a third person for a debt for which there is no liability whatever cannot be wrought by the entry of such *nunc pro tunc* order. A new debt cannot be created at the time of the entry of such an order, to take effect as of a time long past." Similarly here, even if we assume that the *nunc pro tunc* order of the Supreme Court entered June 5, 1933, is binding on the parties in that action, it would not be available to the sheriff, who was not a party. It follows that under the decision in *Perkins* v. *Perkins*, the plaintiff, notwithstanding the order of June 5, 1933, is in a position to assert her rights against the defendant based upon the true facts existing at the time of her husband's release.

We realize that the consequences may seem harsh, for the plaintiff would be able to collect the full amount of the arrears of alimony (probably not collectible otherwise), because the defendant released her husband only seven days before he was entitled to be free. Over such hardship we have no control, for it results directly from the provisions of the statute (Correction Law, § 514), that " if the commitment was for the non-payment of a sum of money, the amount thereof, with interest, is the measure of damages." Here the defendant released the plaintiff's husband before the expiration of the period for which he had been committed, upon an order which, for every purpose, was no more effective than if it had never been made. (See *Bijur* v. *Jacoby*, 260 N. Y. 289.)

The order should be reversed, with twenty dollars costs and disbursements, and motion granted to the extent of directing summary judgment in favor of the plaintiff and against the defendant for the sum of $575, with interest from March 2, 1933, and severing the action as to the balance of the plaintiff's claim.

TOWNLEY, J., concurs.

Order affirmed, with twenty dollars costs and disbursements.